Star Transfer Company, Appellant, v. Underwriters at Lloyds of London, Subscribing Policy No. 29,198, Appellees.

Gen. No. 42,957.

Opinion filed May 2, 1944.

DAVID C. RUTTENBERG, of Chicago, for appellant; ARTHUR A. WOLFINSOHN and DAVID C. RUTTENBERG, both of Chicago, of counsel.

EKERN, MEYERS & MATTHIAS, of Chicago, for appellees; DONALD L. THOMPSON, WILLIAM G. CHORN and ARTHUR F. GRUENWALD, all of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

In a suit brought to recover on a workmen's compensation indemnifying policy, tried by the court upon stipulated facts, plaintiff suffered an adverse judgment from which it appeals. It appears that in August 1935 Underwriters at Lloyds of London issued a blanket workmen's compensation policy wherein they agreed to indemnify Star Transfer Company for any sums in excess of $2,000 that it would be compelled to pay to any of plaintiff's employees claiming compensation for injuries. On June 4, 1936, while in the course of his employment by plaintiff at Grand Rapids, Michigan, one Ivan Wells threw a quarter of beef onto his shoulder, causing his left lower extremity to buckle under him, without being struck by anything or without slipping. X-rays taken at the hospital immediately after the injury disclosed a fracture of the left femur, which had broken off close to the trochanter, or hip socket. G. E. Azzato, an experienced adjuster, was

employed by plaintiff to look after the claim. On July 8, 1936, while Wells was still hospitalized, without any notice or attempt to defend on the merits and without the knowledge or consent of the defendants, plaintiff agreed in writing to pay him $16.20 weekly during partial disability, and total disability as the facts and law should later warrant. The agreement was approved on July 27, 1936 by the Department of Labor and Industry of Michigan, as required by the Michigan Workmen's Compensation Act. None of the defendants nor their Chicago designated agent received notice of the injury until some 16 months after it occurred, notwithstanding provisions of the policy that ''Notice of any accident or disease covered by this Policy shall be given . . . as soon as possible after the accident or disease has been brought to the notice of the Employer,'' and that ''The Employer shall not make any payment, settlement, or admission of liability, in respect of any injury for which the Underwriters shall be liable under this policy, without the consent of the Underwriters.''

Throughout the remainder of 1936 and most of 1937 plaintiff continued to compensate Wells as agreed, until it had paid him $1,134, in addition to $241.90 for his doctors' bills. Defendants first learned of the injury on October 27, 1937, when the matter was called to their attention by Azzato in a letter to their Chicago agent, wherein they were advised that the injury was of a serious nature, that Wells had been hospitalized for 12 weeks, that the fracture was still ununited and had resulted in a two-inch shortening of the leg, and that $16.20 weekly compensation had been paid to Wells since the injury, which then aggregated $1,134. The adjuster suggested that since it would be necessary to continue the partial disability compensation for approximately 52 weeks more, a lump settlement with Wells on the basis of the minimum of 500 weeks' partial compensation, as required by the Workmen's Compensation Law of Michigan, was to be desired, and

concluded by saying that he "thought it advisable to make a report of this occurrence to you at this time, in the event you wish medical examinations or decide to employ Counsel to make such recommendations or assist in any way . . . in employing some method of terminating this claim at this time." After investigation, defendants declined liability, whereupon Azzato negotiated a final settlement with Wells by paying him an aggregate of $5,636.90 for compensation, doctors' bills and attorneys' fees. Plaintiff then brought suit to recover $3,636.90, representing the excess above the $2,000 minimum provided for in the policy.

One of the questions presented for determination is whether timely notice of the accident was given in accordance with the provisions of the policy. Plaintiff contends that it was not required to serve notice of the accident unless and until there was reason to believe that it would cause a loss in excess of $2,000, and that the extent of the injury could not be ascertained earlier than October 1937. Numerous cases are cited touching upon the question of notice. The applicable rule to be deduced from the authorities is that notice is not required until such facts have developed as would suggest to a person of ordinary and reasonable prudence that liability might arise; and the requirement is met by giving notice within a reasonable time after the injury presents aspects of a possible claim for damages. *Updike Inv. Co. v. Employers Liability Assur. Corp.*, 131 Neb. 745, 270 N. W. 107; *National Paper Box Co. v. Aetna Life Ins. Co.*, 170 Mo. App. 361, 156 S. W. 740; *Melcher v. Ocean Accident & Guarantee Corp.*, 226 N. Y. 51, 123 N. E. 81; *Nye v. Louis Ostrov Shoe Co.* (Ohio), 43 N. E. (2d) 103. In the case at bar plaintiff knew the injury was extremely serious because the X-rays immediately disclosed that the ball and socket were disconnected from the femur, and it is admitted that "the bone fragments of the fracture did not normally unite at any time thereafter," and left a permanent shortening of the leg.

Plaintiff cites a statement in R. N. Gray's Attorneys' Textbook of Medicine, 2d ed., p. 1232, predicated on tables compiled by insurance companies, that the temporary disability caused by fractured femurs, continues for an average of 249 days. But plaintiff waited approximately eight months beyond that period before giving notice. This unreasonable delay, after any person of ordinary and reasonable prudence could have ascertained that liability might arise, and after the injury presented aspects of a probable claim for damages, was not in any sense a compliance with the rule invoked, nor with the provisions of the policy.

The other question presented is whether plaintiff's consummation of an agreement with Wells for partial disability and the approval thereof by the Michigan Department of Labor and Industry, without the knowledge or consent of defendants, so prejudiced the latter's rights as to relieve them from liability. It is conceivable, of course, that in view of the peculiar nature of the accident, defendants might have interposed the defense that the injury was due to an inherently defective bone structure, and the deprivation of such right, without the necessity of proving that the results of the litigation would have been different, constituted prejudice. The stipulated facts disclose that within 34 days after the injury plaintiff procured an award foreclosing defendants' right to interpose a defense, because under the law of Michigan where the accident occurred, "Approval of an agreement for compensation and the award thereon is ordinarily conclusive of the employee's right to compensation." *Hughson v. City of Kalamazoo,* 271 Mich. 36, 260 N. W. 111; *Lumbermen's Mut. Casualty Co. v. Bissell,* 220 Mich. 352, 190 N. W. 283. A similar situation arose in *Keehn v. Excess Ins. Co. of America,* 129 F.(2d) 503, which involved excess reinsurance under a policy providing that "The Company shall notify the Reinsurer immediately after it has had notice of any accident in which this reinsurance is or may probably be involved,"

and that "The Reinsurer shall have the right and opportunity to associate with the Company in the defense and control of any claim or suit or proceeding relative to an accident where the claim or suit involves this reinsurance." The excess reinsurer received no notice until almost two years after the injury and after its rights had been prejudiced by court proceedings of which it had not been informed. In the *Keehn* case, the last and only one of three related proceedings in which the excess reinsurer was a party, it defended itself on the ground that it had not been given notice of the accident in compliance with the provisions of the policy hereinbefore quoted. The circuit court of appeals observed that "it would be wasted energy" to consider the authorities from other jurisdictions since the Supreme Court of Illinois had settled the law in two early cases (*Niagara Fire Ins. Co. v. Scammon*, 100 Ill. 644, and *Scammon v. Germania Ins. Co.*, 101 Ill. 621) which had not been subsequently overruled, and held that "The right [to be given notice of the accident and of the original proceedings, if it was likely to involve reinsurer] was provided by the terms of the contract and we are of the view that the deprivation of such right would constitute prejudice without any actual proof that the results of the litigation would have been different." The provisions of the policy in suit are similar to those in the *Keehn* case, and the reasoning employed by the circuit court of appeals in that proceeding is applicable to this suit. With knowledge of the facts, failure to give defendants notice within a reasonable time after the occurrence of the accident was a breach of one of the prime conditions of the contract, the performance of which was assumed by plaintiff.

For the reasons indicated, the judgment of the circuit court should be affirmed, and it is so ordered.

*Judgment affirmed.*

SCANLAN and SULLIVAN, JJ., concur.